## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

—————————————————————

**JOHNNY HALE**
6220 Blackjack Road
Flowery Branch, Georgia 30542,

        **Plaintiff,**

**v.**

**MORELAND ALTOBELLI ASSOCIATES, INC.,**
2211 Beaver Ruin Road, Suite 190
Norcross, GA 30071,

        **Defendant.**

   **Serve Registered Agent:**

      Thomas D. Moreland
      2211 Beaver Ruin Road, Suite 190
      Norcross, GA 30071

—————————————————————

Case No.:_____

**<u>JURY DEMANDED</u>**

## <u>CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL</u>

COMES NOW Plaintiff Johnny Hale, by counsel, to file this Complaint and

Demand for Jury Trial against Defendant Moreland Altobelli Associates, Inc.

## Introduction

### 1.

Plaintiff Johnny Hale ("Hale") brings this complaint against Defendant Moreland Altobelli Associates, Inc. ("MAA") for violations of the Fair Labor Standards Act of June 24, 1938 ("FLSA"), 29 U.S.C. § 201, *et seq.* for withholding overtime payments from a non-exempt employee, and for retaliating against him pursuant to 29 U.S.C. § 215(a)(3), and for violations of the False Claims Act, 31 U.S.C. § 3730 (h), ("FCA") for retaliation against an employee who disclosed or made efforts to stop a false claim against the government.

## Jurisdiction and Venue

### 2.

This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, the FLSA, 29 U.S.C. § 201 *et seq.*, and the FCA, 31 U.S.C. § 3730(h).

### 3.

Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 because it is the judicial district where Defendant committed the unlawful employment practices and retaliation, and because Defendant may be found in this District because Defendant's headquarters is located here.

## Parties

### 4.

Hale is a resident of Flowery Branch, Georgia.

### 5.

Although Hale does not hold a degree in engineering or city planning, he has learned a substantial amount through his work for MAA, and over the past twenty-five years he has worked his way up from a drafting assistant to a design engineer at MAA.

### 6.

MAA has never given Hale a negative performance evaluation.

### 7.

MAA is an engineering and program management firm headquartered in Norcross, Georgia.  Thomas Moreland ("Moreland") established the company in 1987.  Moreland is the former Commissioner of the Georgia Department of Transportation.

## Factual Allegations

### 8.

Over the past three years Hale has worked on two projects for MAA.  MAA had an exclusive contract with the Federal Railway Administration ("FRA") to

inventory all of the railroad crossings in Georgia.  From about 2008 through about April 2012, Hale worked on that project.  In April 2012, Hale moved from the FRA project to the fire protection upgrade project ("FPUP") for Atlanta's Metropolitan Atlanta Rapid Transit Authority ("MARTA").

9.

Hale worked as a technician on the FRA project, photographing railroad crossings and inventorying the features at the crossings.  As a technician, Hale would take existing photos from the road and track in each direction and then photograph the equipment present at each crossing.  Hale would note, based on guidelines and prior experience, what each crossing was lacking so that the U.S. Department of Transportation ("DOT") or FRA could determine what it would cost to upgrade the system.

10.

Out of the 6,000 crossings in Georgia, Hale inventoried about 3,700 of them. There were three other people doing the same work as Hale, but they would only complete four to eight crossings a day.  In contrast, Hale completed between 22 and 35 crossings a day.

11.

Hale was supposed to work eight hours a day, five days a week, inventorying the crossings, but would spend an additional four to five hours a week preparing the reports relating to the crossings.  Hale did not report this time to MAA.

12.

Hale did not report his overtime hours on the FRA project because he knew from past experience that Moreland himself would refuse to pay it.  In addition to refusing to pay his overtime, Moreland sometimes refused to pay Hale at all.  On one occasion, in about 2008, Moreland asked Hale to help him fix a project that suffered from multiple errors made by the engineer.  Hale spent about sixty hours fixing the engineer's errors.  When Hale submitted his time, Moreland refused to pay it, saying that there was no money in the budget for Hale's extra work.

13.

While working on the FRA project Hale received a $75 per day hotel allowance and a $25 per day per diem.  Hale earned $21.50 while working on the FRA project for each hour worked, and MAA paid the same rate for any overtime hours.

14.

Hale transferred to the MARTA fire protection upgrade project in April 2012.  Hale's direct supervisor at MAA was L.M. Manchi, the Vice President in charge of MAA's high speed rail and transportation division.

15.

Hale also reported to Matt Crow, a project engineer for MARTA.  MARTA contracted with Metropolitan Atlanta Transit Consultants ("MATC"), a conglomerate of engineers, to complete many projects at MARTA.

16.

MARTA contracted with MAA to provide Hale as an inspector for the new fire system, sprinkler system, and clean agent system that MARTA was upgrading in along its system.   Hale was the only MAA inspector working on MARTA's FPUP project.  MAA billed Hale out at about $125 an hour.

17.

A clean agent system is a system that puts out fires in control rooms or computer areas using a dry chemical.  The chemicals do not introduce moisture so that the systems are not shorted out.  The chemical essentially removes the oxygen from the room to put out the fire without damaging the equipment in the room.

18.

As an inspector, Hale was responsible for providing access for contractor crews from MC Dean to work at various sites throughout the system and securing the spaces so that the public and the crews were safe. Hale also monitored the contractors' count sheets, daily lists of the materials used throughout the day in order to track the materials used and billed on the project, and provided a daily report of activities that memorialized which laborers were there on a particular day, what equipment they used, which areas they worked on, etc., and coordinated with other personnel within MARTA, including track personnel, rail control, and police etc. Hale worked with the crews throughout the day.

19.

Hale worked on the FPUP project from Monday through Thursday from 5:30 a.m. to 4:00 p.m. -- essentially four ten-hour days.

20.

Hale was known at his worksites for being a good worker, and a talented worker.

21.

In addition to working on the FPUP project, Hale completed additional work on the MARTA project on Fridays or Saturdays. Hale did not complete any additional work on other (non-FPUP) projects during the days that he was

scheduled to work on the FPUP project.  Moreland appreciated Hale putting in the extra hours, because it meant more revenue for the company.

22.

While working on the MARTA project, Hale earned $30 an hour for any hours worked, including overtime.

23.

During Hale's time on the MARTA contract, MARTA would require Hale to attend various meetings.  Moreland would refuse to pay Hale for the meetings, saying that they were not MAA-mandated meetings.

24.

Hale routinely worked twelve (12) to twenty-eight (28) hours of overtime a week from home at night completing all of the various required reports.  Hale could not have done this during the day because had had to monitor the crews. Hale did not report these extra hours to MAA because he believed that Moreland would refuse to pay you for those hours.

25.

In addition to the overtime, Hale worked an average of fourteen (14) hours a week on the extra projects and reported the hours worked on his weekly timesheets to MAA.

26.

When Hale began the contract, he worked at MARTA's Avondale station for about four months.  Hale became concerned that the work that the MC Dean contractors were performing.  Hale noticed that MC Dean had installed a fire panel on the wrong wall and that it needed to be relocated.  He raised the issue with Crow, the MARTA project engineer; Terry Rogers, Quality Assurance/Quality Control manager for MC Dean; and Dan Cairo, the project superintendent employed by MC Dean.  The crew eventually relocated the panel, but the MC Dean staff did not take the issue as seriously nor move as quickly as was necessary.

27.

Later during Hale's four-month tenure at the Avondale station, he noticed that MC Dean had also mounted a horn strobe light on the wrong wall.  Mr. Hale raised the issue again with Crow, Rogers, and Cairo.  MC Dean eventually moved the strobe.

28.

In September 2012, Hale noticed the workers on the project creating excess waste on jobs involving copper wire.  Hale admonished the workers to make more precise measurements and conserve wire.  The workers told him they were intentionally overusing the wire so that they could collect the scraps and sell them

to finance trips to Hooters.  Larry King, an electrician on the job, bragged to Hale that King had earned $1,200 to spend at Hooters from illicit copper wire sales.

29.

On February 5, 2013, Hale began to supervise the Georgia State MARTA station.  He immediately noticed that none of the names or numbers on the rooms matched the names or numbers the rooms carried on the plans.  The misnumbering poses a tremendous public safety threat because first responders rely on building plans to execute rescues, seal off rooms with flammable materials during fires, and locate personnel during emergencies.  Hale notified Crow, who said he would contact the architect.  Hale took the architect through the station and pointed out each of the errors, but to Hale's knowledge, as of this filing, the room numbers have not been corrected.  Hale memorialized the error in his Inspector's Daily Report ("IDR").

30.

While working at the Georgia State station, Hale supervised two MC Dean workers whose production was at only twenty-five (25) percent of what MARTA required per day.  Hale recorded these employee's shortfalls in his IDR.  David White, MARTA foreman, was supposed to review thee IDRs, but he took no action.

31.

Hale worked well with the crews at the Georgia State station at first. However, the dynamic changed in April 2013. Hale took a pre-scheduled vacation and in his absence, another inspector, Scott Charette, ("Charette") employed by another contractor, came in.

32.

Charette did not take his work seriously and did not work as diligently as was necessary. Charette would constantly distract the crews by sharing his personal life with them and by showing them pictures and videos on his phone.

33.

The FPUP project was scheduled to take 114 days. However, due to Charette's lax attitude, the project was on track to run at least sixty-six (66) days over schedule. Further, the Georgia State station is a station located near many government offices and Hale knew that increased the likelihood that a local and/or state official would pass through the station and observe the crews not working diligently. Hale was concerned that the contractors did not work hard enough to strategically prolong their time on the contract.

34.

On May 9, 2013, Hale arrived at the Georgia State station before 6:00 a.m.

He was scheduled to facilitate opening the escalator pits so that the MC Dean crew could work in the pits during the day.  By 6:30 am, no crew members from MC Dean were present, and none had arrived by 6:30 a.m., so Hale called the MC Dean superintendent, Robert Woods, ("Woods") and demanded to know where the crews were.  Woods stated that he did not know.  Hale commented, in frustration, that so much time had been wasted on the contract, a little more time did not matter. When Woods asked Hale what he meant, Hale told Woods about Charette buying the crew breakfast, wasting time, and watching videos, while elderly and disabled customers who needed to use the escalators struggled to move through the station. Hale also commented that the project was behind schedule due to the work ethic of the crews and of Charette.

35.

Shortly after Hale's May 9, 2013 call with Wood, David White, the MARTA foreman, called.  White asked Hale to discuss some of the problems on the work site.  Hale repeated the concerns he raised with Wood.

36.

Later in the morning on May 9, 2013, Hale spoke with Rogers and in addition to the information he shared with Wood and White, Hale reported more shoddy work that the crew had done installing conduits.

37.

After his call with Rogers, Hale received a call from Rich Boullain, a MATC consultant hired by MARTA, who instructed Hale to vacate the job and report to Doug O'Donnell, the senior engineer of Boullain's consultancy, MATC.  When O'Donnell met with Hale on May 9, 2013, O'Donnell informed Hale that Hale was no longer allowed to work on the FPUP job.

38.

During the meeting, O'Donnell told Hale that Hale was probably better off not working on the job because the Federal Transportation Administration ("FTA") was concerned about the FPUP project and was giving it closer scrutiny.

39.

That afternoon, Hale conveyed all of the discussions he had with White, Wood, and O'Donnell to Moreland.  Moreland commented "Boy, I ought to kick your ass."

40.

From May to July 2013, MAA only assigned Hale to roughly twenty (20) hours of work each.  The sudden reduction in work represented about $14,000 in lost income to Hale.

41.

On August 3, 2013, Hale submitted to MAA a timesheet for 46.50 hours of work for the seven-day pay period ending that day.  It included a seven-hour day on Saturday.  MAA paid Hale his weekly wage-rate for the entire 46.5 hours, and did not pay an overtime rate for the additional six-and-a-half hours.  During the same period, Hale had to file an "overtime authorization" sheet for the weekend work with MATC.

42.

On August 8, 2013, Hale alerted MAA, through counsel, about his concerns regarding MAA's withholding of overtime pay and retaliatory activities.

43.

On August 10, 2013, Hale submitted to MAA a timesheet for 41.50 hours of work for the seven-day pay period ending that day.  It included an eight-and-one-half-hour day on Saturday.  MAA paid Hale his weekly wage-rate for the entire 41.5 hours, and did not pay an overtime rate for the additional hour and a half. During the same period, Hale had to file an "overtime authorization" sheet for the overtime work with MATC.

44.

On August 16, 2013, Boullian informed Hale that Hale cannot work more than 40 hours per week at MARTA based on a request from Moreland. Hale was the only person at MARTA whose overtime was frozen.

45.

On August 17, 2013, Hale submitted to MAA a timesheet for 55 hours of work for the seven-day pay period ending that day. It included a fourteen (14) hour day on Saturday. MAA paid Hale his weekly wage-rate for the entire 55 hours, and did not pay an overtime rate for the additional fifteen (15) hours. During the same period, Hale had to file an "overtime authorization" sheet for the overtime work with MATC.

46.

On August 19, 2013, Moreland and Boullain called Hale eight (8) times leaving six (6) voicemails requesting a meeting.

47.

On October 25, 2013, Hale reviewed his pay check stub and was surprised to find that it reflected 118 hours of vacation time spent over the course of the year, which he had not, in fact, taken. Hale called the MAA office to check on the

discrepancy, but the office refused to confirm how much vacation leave Hale had accrued to that point.

48.

On October 31, 2013, Moreland summoned Hale to a meeting.  During the meeting Moreland told Hale that out of concern for Hale's health that Hale should not be working so many overtime hours.  Hale has no health problems that would prevent him from working overtime hours.

49.

In a letter dated Nov. 1, 2013, Moreland closed out the correspondence writing "please remember Johnny that you are an MA employee."

determine whether I think it is sufficient.  Please remember Johnny that you are an MA employee and as such we need to know where you are and what you are doing and what your working conditions are.

Sincerely,

Thomas D. Moreland, PE
Chairman/CEO

49.

On November 2, 2013, Hale submitted to MAA a timesheet for forty-one (41) hours of work for the seven-day pay period ending that day.  MAA paid Hale his weekly wage-rate for the entire forty-one (41) hours, and did not pay an

overtime rate for the additional overtime hour.  During the same period, Hale had

to file an "overtime authorization" sheet for the overtime work with MATC.

**COUNT I**
**Fair Labor Standards Act of 1938 (FLSA)**
**29 U.S.C. § 201, *et seq*.**
**Wage Theft**

49.

Hale hereby incorporates all allegations set forth in the foregoing paragraphs

as though fully alleged herein.

50.

Hale is an "employee" and MAA is an "employer" as § 203 of the FLSA

defines those terms.

51.

FLSA §§ 206-07 requires covered employers to pay their employees for all

work performed, and at a rate of time-and-a-half for work performed in excess of

forty (40) hours per week.

52.

Hale's primary duties for MAA did not require an advanced degree, nor did

Hale hold one.

53.

Hale did not hire, fire, train, evaluate or determine pay rates for other

employees for MAA.

54.

Hale's primary job responsibilities did not involve decisions related to management policies or general business operations.

55.

MAA does not pay Hale an annual salary.

56.

Hale earns hourly wages from MAA that fluctuate depending on how many hours he works in a given pay period.

57.

Over the twenty-five (25) years that Hale has worked for MAA, MAA has never paid Hale at an overtime rate when Hale's hours exceeded forty (40) hours a week.

58.

By paying Hale an hourly wage, but not compensating Hale at time-and-a-half for hours Hale works over forty (40) in a given pay period, MAA has violated the FLSA and harmed Hale financially. Hale therefore asks the Court to award damages in an amount to be proven at trial and to grant the withheld wages MAA

illegally withheld, with costs and interest, attorneys' fees, costs, and such other equitable and legal relief that this Court deems just and proper to award.

## COUNT II

**Fair Labor Standards Act of 1938 (FLSA)**
**29 U.S.C. § 201, *et seq*.**
**Retaliation under the FLSA**

59.

Hale hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

60.

The FLSA prohibits an employer from discharging or in any other manner discriminating against any employee because the employee "filed any complaint or instituted or caused to be instituted any proceeding under or related to" the Act, "or has testified or is about to testify in any such proceeding…"  29 U.S.C. § 215.

61.

On August 8, 2013, Hale caused to be delivered to MAA a letter from his attorney making a complaint about MAA's failure to pay Hale properly for his overtime work.

62.

On August 16, 2013 MAA instructed Hale, and no other MAA employees,

that he was not allowed to work overtime hours in retaliation for and because of the August 8, 2013 letter.

63.

MAA further retaliated against Hale after Hale questioned his overtime compensation by calling Hale frequently during the work day on his cellular phone, berating him in meetings, and otherwise treating him with hostility.

64.

As a direct and proximate result of MAA's illegal and retaliatory actions, Hale has suffered damages in an amount to be determined at trial and respectfully requests that this Court enter judgment for Hale and against MAA, to grant liquidated, economic and all other allowable damages, equitable relief, and attorney's fees and costs.

<b><u>COUNT III</u></b>

<b>False Claims Act (FCA)<br>31 U.S.C. §§ 3729-3730<br>Retaliation under the FCA</b>

65.

Hale hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

- 20 -

66.

The FCA prohibits retaliation against employees who disclose or make efforts to stop one or more false claims from being submitted.  This protection extends to internal reporting to a supervisor or company compliance department and to refusals to participate in misconduct that leads to false claims, whether or not such steps are clearly in furtherance of a potential or actual qui tam action.

67.

MARTA's FPUP project drew funds that Congress granted through the American Reinvestment and Recovery Act ("ARRA").

68.

In his IDRs, Hale recorded for his supervisors instances of waste, fraud and abuse in an effort to stop false claims being made to the government.

69.

The conversations Hale had with Wood, White, Boullain, and Moreland on May 9, 2013 were all efforts to stop waste, fraud and abuse in an effort to stop false claims being made to the government.

70.

MAA retaliated against Hale for Hale's disclosures when it removed Hale from the FPUP project on the same day that Hale discussed the project's gross mismanagement with representatives from MC Dean, MARTA, and MAA.

71.

MAA further retaliated against Hale when it reduced Hale's work
assignment to approximately twenty (20) hours a week for six weeks in May and
June 2013 and for four weeks in July 2013 – immediately after Hale's disclosures
of waste, fraud, and abuse on the FPUP project.

70.

The August 8, 2013 letter that Hale caused to be sent to MAA was in an
effort to stop waste, fraud and abuse in an effort to stop false claims being made to
the government.

71.

The October 31, 2013 conversation that Hale had with Moreland was an
effort to stop waste, fraud and abuse in an effort to stop false claims being made to
the government.

72.

As a direct and proximate result of MAA's illegal and retaliatory actions,
Hale has suffered damages in an amount to be determined at trial and respectfully
requests that this Court enter judgment for Hale and against MAA, to grant
liquidated, economic, special and all other allowable damages, equitable relief, and
attorney's fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Johnny Hale prays this Honorable Court grant the following relief:

1. Compensation for withheld wages with interest;

2. Double back-pay and interest on back pay;

3. Liquidated damages;

4. Attorney's fees and costs;

5. Pre-judgment interest; and

6. Any other economic, compensatory, liquidated, punitive, or equitable damages that this Court sees fit to award.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

THE FOGLE LAW FIRM, LLC

By: /S/ H. Glenn Fogle, Jr.
H. Glenn Fogle, Jr.
55 Allen Plaza, 55 Ivan Allen Jr. Boulevard, Suite 830
Atlanta, GA 30308
Tel. (404) 522-1852
Fax (404) 681-9770
glenn@foglelaw.com
*Counsel for the Plaintiff*

THE EMPLOYMENT LAW GROUP, P.C.

By:  <u>R. Scott Oswald</u>
R. Scott Oswald *(To be admitted Pro Hac Vice)*
Adam Augustine Carter *(To be admitted Pro Hac Vice)*
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
Tel. (202) 261-2803
Fax (202) 261-2835
soswald@employmentlawgroup.com
acarter@employmentlawgroup.com
*Counsel for the Plaintiff*